UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JEANNE C. EDWARDS, SANDRA
SORIA, CAROLE L. HUPPERT,

                              Plaintiffs,

         v.                                                          1:08-CV-803 (LEK/RFT)


CITY OF KINGSTON, STEVEN
GORSLINE,TIM WILLIAMS,

                              Defendants.
_____


**MEMORANDUM-DECISION AND ORDER[1]**


I.        **INTRODUCTION**

         Plaintiffs Jeanne C. Edwards, Sandra Soria and Carole L. Huppert filed this suit on July 24,

2008, alleging, pursuant to 42 U.S.C. § 1983, violations their right to equal protection under the

14th Amendment.  Dkt. No. 1.   Plaintiffs also allege violations of Title VII of the Civil Rights Act

of 1964, having received a right to sue letter from the United States Justice Department dated

October 9, 2008.  Pls.' Statement of Material Facts ("PSMF") (Dkt. No. 18) ¶4; Dkt. No. 19, Ex. 14.

Plaintiffs name as Defendants Steven Gorsline, Tim Williams and the City of Kingston, New York.

After the close of discovery, Defendants filed a Motion for summary judgment on October 15, 2009.

Dkt. No. 16.  For the following reasons, Defendants' Motion is denied in part and granted in part.

_____

         [1]For printed publication.

## II.      BACKGROUND

This case arises from allegations of a hostile work environment and gender discrimination occurring within the Department of Public Works ("DPW") of the City of Kingston ("City"), where the Plaintiffs were or remain employed.  Jeanne Edwards ("Edwards") was an employee from approximately October 5, 2005 to June 29, 2009; at the time her Complaint was filed, she still worked for DPW as a code enforcement officer.  Def's. Statement of Material Facts ("DSMF") (Dkt. No. 16) ¶1.  Sondra Soria ("Soria") and Carole Huppert ("Huppert"), both still employed by the City, have worked for the DPW since 2004 and 2002, respectively.  Id. ¶¶ 2-3; Plts.' Response to Def's Statement of Material Facts. ("PRSMF") (Dkt. No. 18) ¶¶ 1-3.  Defendant Steve Gorsline ("Gorsline") was employed as the Superintendent of the DWP for the period relevant to this litigation, and Defendant Tim Williams ("Williams") was employed with the DWP from 2002 through March 2008 as a Senior Clerk and from March 2008 through August 2008 as Assistant Superintendent.  DSMF ¶¶ 5-8.  Defendant City of Kingston is a municipal corporation under the laws of New York and is located in the County of Ulster, New York.  Id. ¶ 4.  The DPW is one of the fourteen departments of the City, which is headed by a Mayor, non-party James Sottile, who exercises executive authority.  PSMF ¶¶ 5-7.  The three female Plaintiffs in this case allege a series of events and workplace conditions, along with inadequate actions by the City, which they assert constitute gender discrimination, sexual harassment, and retaliation actionable under § 1983 and Title VII.  There are extensive factual disputes between the parties concerning the alleged acts which give rise to Plaintiffs' claims; Defendants predominantly deny the substance of those allegations or the meaning attributed to them by Plaintiffs.

*a. Edwards*

2

Mayor Sottile hired Edwards on a provisional basis in 2005, and she became a permanent employee upon passing a civil service test. Plts.' Counter Statement of Material Facts ("PCSMF") (Dkt. No. 18) ¶¶ 15-17. Edwards, a breast cancer survivor, had undergone a mastectomy prior to her employment with the City. According to Edwards, she heard male co-workers in 2006, including Superintendent Gorsline, discussing Plaintiff Huppert's breasts, betting on characteristics of her undergarments, and discussing how they stood under a stairway to peer up at Huppert. Id. ¶19. She alleges that on another occasion Defendant Williams and a non-party supervisor spoke about "69," and that Defendant Gorsline proceeded to explain the sexual connotation of term to her, much to her embarrassment. Id. ¶ 20. Edwards also alleges that Gorsline made various "demeaning comments" about Huppert. Id. ¶ 21.

According to Plaintiff Edwards, in October 2007, Gorsline had the Mayor appoint non-party Michelle Feliciano as a second code enforcement officer, with whom Plaintiff alleges that Gorsline began an affair. Edwards asserts that the Mayor did not know if Feliciano, a 23 year old woman who had previously been a waitress, was qualified and that he did not interview anyone else for the position, which was created for her. Id. ¶¶ 23-27. Moreover, Edwards states that Felicano never applied for the code enforcement position, believed that she had been brought to the Mayor's office to become a temporary receptionist, and did not know what code enforcement work entailed. Id. ¶¶ 27-28. Feliciano received extensive preferential treatment according to Edwards, and, although failing the civil service test, was allowed to stay to retain her position for approximately a year. Id. ¶¶ 31-35. When the City's Safety Officer, Lawrence Brigati, told the Mayor that Gorsline's private relationship with Feliciano was interfering with the DWP workplace, Mayor Sottile is alleged to have responded that the matter was non of his business. Id. ¶ 38.

In December 2007, Edwards recounts that Defendant Williams walked to her desk with oranges tucked in his shirt to emulate breasts; she alleges that Williams did this sort of "joking around" in the office on other occasions, including pretending to wear a brassiere.  Id. ¶¶ 39-40, 43. Edwards expressed her distress with Williams' conduct, which she concluded referenced the fact that she did not have two breasts.  Id. ¶ 41. She alleges that Defendant Gorsline knew about this incident but did not speak to Williams about it.  Id. ¶ 42.  Edwards also alleges that Williams would 'take photos of people and then 'put big penises on them' and 'then show everybody.'"  Id. ¶ 44.

In March 2008, Edwards recounts an incident wherein she entered the DPW office and Williams threw at her a fake or artificial breast, which had been extant in the office at a number of previous times and read "suck off the government tit."  Id. ¶ 45.  Thereafter, Edwards threw the object back and withdrew to the bathroom in shock and distress; later, Edwards told Defendant Gorsline that she wished to filed a sexual harassment complaint.  Id. ¶ 53.  Gorsline, who was in attendance and participated in throwing the object, recalls that such activity was consistent with "the way the office was" and that Edwards was a willing participant.  Id. ¶¶ 47-51; Dkt. No. 19, Ex. 1.  In Gorsline's view, the fake breast was a "fixture in the office just like the painting on the wall."  See Dkt. No. 19, Ex. 1.  The Mayor, in his deposition, states that he then received a call from Gorsline informing him of the incident and that Edwards was offended.  Gorsline, however, denies that he spoke to the Mayor about the matter.  PCSMF ¶¶ 54-57; Dkt. No. 19, Ex. 1, 3.  Approximately one month after the incident, Plaintiffs allege that a female temporary worker discovered the fake breast in a drawer at the office, which allegedly upset Edwards and caused her to begin crying and yelling "enough is enough."  PCSMF ¶¶ 60-61.  She asserts that she complained that the office was a sexually hostile environment that made it difficult for her to perform her job, but Gorsline and other

4

city officials took no disciplinary action against Williams or any other action to rectify the situation. Id. ¶¶ 62-65.  Rather, only weeks after the throwing incident and after Edwards complained to the New York State Division of Human Rights about Williams' conduct, Gorsline promoted Williams to Assistant Superintendent, making him Edwards' supervisor.  Id. ¶ 66.  Then, after the Mayor learned of Edwards' Human Rights Complaint, he appointed Williams, whose role in the incident was known to the Mayor, to a new three-person sexual harassment panel.  Id. ¶ 67.

In April 2008, Edwards attended a meeting of the City of Kingston Human Rights Commission, where she explained her experiences at DWP.  Non-party Tawana Washington, a staff person for the Commission, expressed that there was little or nothing that could be done by the Commission because the harassing persons worked for the Mayor, but that Edwards should bring her complaint to Albany.  Id. ¶ 71.  Following Edwards' communications with the Commission and complaints made through legal counsel in May, she alleges that "she has been retaliated against: job responsibilities have been taken away from her, she has been excluded from a work area she needs to access to do her job . . . she has also been selectively written up by defendant Williams for no cause; her office was moved to an inferior space."  Id. ¶ 73.  After this suit was filed, Edwards alleges that the women were separated from the men at DPW, and Edwards was relocated to a dirty, unventilated room in disrepair situated between two bathrooms.  Id. ¶¶ 77-78.  Edwards protested these conditions, which she alleges Tawana Washington called "disgusting" and "unacceptable." Also after the lawsuit was filed, the Mayor converted Edwards from a full-time to part-time position, which is alleged to have been the only position to have been so altered.  Id. ¶¶ 81-83.  The Kingston Common Council overrode that decision, however, retaining money in the City budget through the 2009 fiscal year for Edwards' job.  But on June 29, 2009, the Mayor terminated

Edwards' employment, while eliminating no other jobs at that time.  Id. ¶¶ 84-88.  Subsequently, months after the firing and a week before her deposition, Edwards alleges that the Mayor offered her a position which she had not applied for as a laborer for the City.  Id. ¶ 89.

     *b. Soria*

In March 2007, Plaintiff Soria began working in the DPW while continuing to serve, when called, at her previous job with City Bus.  Among approximately 20 drivers employed by the City, Soria is the only female, and it is understood that since some time in the 1970s Kingston has not otherwise had a female driver.  Id. ¶¶ 92-94.  Edwards alleges that she heard male co-workers complain when Soria when transferred to the DPW, and that DPW staff indicated that they would "work her and they'll get rid of her."  Id. ¶ 97.  Soria alleges that non-party Ricky Kinyon, a co-worker at DPW, "used to tell me that I got the job because I went under the Mayor's desk . . . ."  Id. ¶ 97.  Co-workers are alleged to have told Soria that she was taking a man's job and thus should accept the working environment, which included frequent discussion of sex and which made Soria uncomfortable.  Id. ¶¶ 101, 104-105.  Allegedly, Kinyon persisted in touching and making sexually charged remarks to Soria despite demands for him to stop and statements that she would tell his wife of his conduct. Id. ¶¶ 98-99.  On one occasion, Kinyon threw a fake penis at her, an incident that Gorsline learned of the following year and did not speak about with Kinyon. Id. ¶¶ 102-103. Soria recounts that the City trucks sometimes had pornography in them, one had a nude calendar, and the DPW garage had a number of scantily clad images of females displayed.  Id. ¶¶ 108-110.

Soria asserts that because she had not received any training on sexual harassment, she did not identify the environment at DWP as involving such.  The DPW facility did not post any

6

information addressing sexual harassment.  Id. ¶¶ 106-107.  With respect to the pornographic and sexual material, Defendant Gorsline was not aware of a policy against it, and, accordingly, he did not seek to have any of it removed. Id. ¶¶ 112-114.  Additionally, Soria alleges that she was subject to bullying by male DPW employees, which Gorsline did nothing to address.  Soria went to the Mayor about a specific incident of bullying involving non-party Mark Jackson; the Mayor did not communicate about it again with Soria, but Gorsline and Jackson later met with her, at which time Jackson is alleged to have curtly apologized and then exited.  Id. ¶¶ 118-125.  Afterward, non-party Mike Williams, another DPW employee, told Soria that she should do something to stop Jackson from harassing all the women at the Department.  Id. ¶¶ 127-128.

Soria then met with Tawana Washington, who informed her that she should make a formal complaint and attend the next meeting of the Kingston Human Rights Commission.  Id. ¶ 129. Soria contacted Plaintiff Huppert, whom she "barely knew," and Huppert related that Jackson harassed her, as well, and that Gorsline blamed her rather than confronting the problem.  Id. ¶¶ 130-131.  Soria communicated at this time with Plaintiff Edwards, who confirmed that Jackson harassed her without any intervention by DPW or City authorities.  Id. ¶ 132.  Soria and Edwards proceeded to attend the Human Rights Commission meeting on April 9, 2008, where they explained the circumstances of their workplace.  Plaintiffs allege that the commissioners commented that the conduct constituted sexual harassment; stated that, in effect, they lacked jurisdiction or ability to directly help or investigate; recommended the women obtain legal counsel from outside Kingston; and advised them to bring their complaints to the New York State Division of Human Rights in Albany.  Id. ¶¶ 135-138, 143.  At the time of conduct giving rise to this suit, Soria asserts that the City had no policy governing sexual harassment, provided no staff training on the subject, and had

not publicly designated a person to whom sexual harassment complaints should be made; Washington corroborates that, as of May 2008, the City did not provide staff training on sexual harassment.  Id. ¶¶ 145-146.  Only after the filing of Plaintiffs' Complaint did the Mayor institute sexual harassment training for City employees.  Id. ¶ 155.

Soria alleges that some retaliation has occurred after putting the Mayor on notice of her sexual harassment complaint on May 6, 2008.  She asserts that her lunch and breaks are scrutinized; her co-workers and foreman do not speak to her and "project a highly negative attitude;" overtime opportunities have abruptly ceased but are given to male co-workers; her work with City Bus ended; and she found a pornographic movie placed by someone on her truck's seat, an incident which Gorsline did not investigate.  Id. ¶¶ 148-154.

### c.  Huppert

Plaintiff Huppert alleges that "the terms and conditions of her employment were inferior to those of male employees and that her gender accounted for the disparate treatment . . . ." Id. ¶ 158. In the DPW, she has worked as an administrative aide since 2002, a position for which she passed a civil service test and which includes duties involving department payroll, phones and attendance. Id. ¶¶ 159-160.  As with Plaintiffs Edwards and Soria, Huppert recounts that no sexual harassment training or policy existed prior to the filing of her complaint, and that Gorsline "failed to enforce basic standards of decency in the workplace when men engaged in blatantly improper conduct, while he [wrote] up plaintiff Huppert for minor errors."  Id. ¶ 164.  Rather, she alleges that Gorsline allowed Mark Jackson to "engage in aggressive, demeaning behavior towards her" and that Gorsline himself acted with anger towards her, including throwing a phone at her and punching a hole in a

wall on different occasions.  Id. ¶¶ 164-165, 167.  Huppert also alleges that Gorsline and Defendant Williams harassed her in ways that they did not do with respect to male employees, such as calling her phone from within the office and then hanging up.  Id. ¶ 166.  In April 2007, Huppert alleges that she was presented with a "bitch of the year" certificate from Gorsline, something which Gorsline denies.  Id. ¶¶ 172-173.  In December 2007, Defendant Williams placed oranges in his shirt, as mentioned above, in front of Huppert, and she later witnessed Williams throwing the fake breast around the office.  Id. ¶¶ 175-177.  While training a temporary employee thereafter, Huppert opened a file cabinet which contained the artificial breast.  Id. ¶ 178.  According to Huppert, Gorsline ignored her concerns of harassment throughout this period, and that in May 2008, after Huppert complained of discrimination, Gorsline denied her access to the main DWP office and another area necessary for her job by changing locks and preventing her from obtaining a working key.  Id. ¶¶ 184-185.

Plaintiffs allege that Gorsline, in 34 years of employment with the City, did not receive any training regarding sexual harassment until Plaintiffs initiated their complaints; some training was provided by the City to managerial and non-managerial employees in 2008.  Id. ¶¶ 186-192. Relatedly, the City is alleged to have had no system in place for addressing sexual harassment or discrimination claims prior to Plaintiffs' complaints; only afterwards did the City create a Sexual Harassment Panel, which included Defendant Williams as one of its three members.  Id. ¶ 193, 197-199.  Plaintiffs allege, and Tawana Washington affirms, the panel never met after its first meeting. Id. ¶ 202.  The Mayor at no point disciplined Gorsline or Williams in relation to Plaintiffs' allegations.  Id. ¶ 206.

### III.    STANDARD OF REVIEW

Defendants seek summary judgment as to all claims brought be Plaintiffs.  Dkt. No. 16.

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled  to a

judgment as a matter of law."  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law

will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby Inc., 477 U.S.

242, 248 (1986).  Summary judgment is appropriate "only when no reasonable trier of fact could

find in favor of the nonmoving party."  Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

Once the moving party meets its initial burden of showing there is no genuine issue of

material fact, it is then up to the non-moving party to do "more than simply show that there is some

metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S.

574, 586 (1986).  "The non-moving party may not rely on mere conclusory allegations nor

speculation, but instead must offer some hard evidence showing that its version of the events is not

wholly fanciful."  D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

When considering a motion for summary judgment, the court must resolve all ambiguities

and draw all reasonable inferences in favor of the non-moving party.  Nora Beverages, Inc. v. Perrier

Group of America, Inc., 164 F.3d 736, 742 (2d Cir. 1998).  "[T]he trial court's task at the summary

judgment motion stage of the litigation is carefully limited to discerning whether there are any

genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this

point to issue-finding; it does not extend to issue-resolution." <u>Gallo v. Prudential Residential</u>

<u>Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).

**IV.    DISCUSSION**

In seeking to dispose of Plaintiffs' claims, Defendants present five arguments to this Court.

They contend that no liability can be attributed to the City for Plaintiffs' § 1983 claims; that

Plaintiffs' § 1983 claims against Gorsline and Williams in their individual capacities are barred as a

matter of law; that the individual Defendants may not be held personally liable under Title VII; that

the record does not establish that the alleged harassment was sufficiently severe or pervasive so as

to create a hostile work environment; and that even if there was a hostile work environment, the

City cannot be held liable.  Defs.' Memo. of Law ("DML") at 2 (Dkt. No. 16).  The Court finds that

summary judgment must be denied on all but the third of these arguments: the individual

Defendants may not be held personally liable under Title VII.

*a.  § 1983 Municipal Liability Claims*

To properly plead a § 1983 claim, "a plaintiff must allege that (1) the challenged conduct

was attributable at least in part to a person who was acting under color of state law and (2) the

conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States."

<u>Snider v. Dylag</u>, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted).  If a plaintiff advances a claim

seeking municipal liability, under <u>Monell v. New York City Dep't of Social Services</u>, 436 U.S. 658,

694 (1978), the plaintiff must plead that a municipal policy or custom directly caused the

complained-of constitutional injury; a theory of respondeat superior or vicarious liability cannot

give rise to municipal liability under § 1983.  Canton v. Harris, 489 U.S. 378, 385 (1989); see also

Collins v. City of Harker Heights, 503 U.S. 115, 120-121 (1992).  A custom or policy may be

shown by a final policymaker committing or commanding the complained-of constitutional

violation.  Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000).  "Where the contention is not that the

actions complained of were taken pursuant to a local policy that was formally adopted or ratified but

rather that they were taken or caused by an official whose actions represent official policy, the court

must determine whether that official had final policymaking authority in the particular area

involved."  Id.  The existence of such authority presents a legal question which turns on state law.

Id. (citing, inter alia, Jett v. Dallas Independent School District, 491 U.S. 701, 737 (1989) and

McMillian v Monroe County, 520 U.S. 781, 786 (1997)).  "Circumstantial proof, such as evidence

that the municipality so failed to train its employees as to display a deliberate indifference to the

constitutional rights of those within its jurisdiction" may support a finding a policy or custom

existed.  Ricciuti v. New York City Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991).

Defendants correctly recite that, under § 1983, vicarious liability may not be imposed on a

municipality for the acts of its employees merely on the basis of its status as employer.  Plaintiffs,

however, are suing the City on the ground that the it failed to take reasonable steps to address

known and persistent sexual harassment within the DPW; this is, they allege that a custom or policy

existed in the DPW which permitted sexual harassment and gender discrimination in violation of the

Equal Protection Clause of the 14th Amendment.  If "discriminatory practices of city officials are

persistent and widespread, they could be so permanent and well settled as to constitute a custom or

usage with the force of law, and thereby generate municipal liability."  Sorlucco v. New York City

Police Dep't, 971 F.2d 864, 870-71 (2d Cir. 1992) (citations and quotations omitted).  The persistent

practices of subordinate city employees can give rise to municipal liability if "their discriminatory practice [are] so manifest as to imply the constructive acquiescence of senior policy-making officials." Id.

Plaintiffs describe circumstances prevailing in the City of Kingston wherein pervasive sexual harassment and discrimination occurred at the DPW, the City lacked any policy prohibiting such harassment and discrimination, the City provided no training or procedure for dealing with such conduct, and the DPW Superintendent and Mayor failed to act in the face of such conduct. Defendants make only a brief and unpersuasive argument that "there is clearly no proof in the record that the City of Kingston promulgated any policy or custom to suggest that sexual harassment or other discrimination of females was acceptable." DML at 4. In asserting this argument, Defendants' characterization of the record is at odds with the materials before this Court, as it ignores the pattern of sexual harassment alleged by Plaintiffs and the apparent absence of efforts by either Superintendent Gorsline or the Mayor to halt it as well as the lack of a preventative training program and complaint or grievance process. Moreover, the only case to which the Defendants cite as support for their argument, Kern v. City of Rochester, 93 F.3d 38 (2d Cir. 1996), is wholly inapposite; it deals with a claim based upon the sexual assault of an employee by her supervisor rather than allegations of a pattern of sexual harassment going unchecked within a municipal department. In sum, extensive issues of material fact remain in this case which directly bear upon whether the City may be held liable under § 1983. In this Circuit, courts are "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." Schwapp v. Town of Avon,118 F.3d 106, 110 (2d. Cir. 1997). Defendant's Motion that, as a matter of law, the City cannot be held liable is denied.

13

   b.  *§ 1983 Individual Capacity Claims*

   Second, Defendants seek to dismiss the Equal Protection Clause claims brought against Gorsline and Williams in their individual capacities.  Plaintiffs assert that Defendants violated their equal protection rights through the creation of a hostile work environment and by engaging in disparate treatment on the basis of their gender.  Compl. at 6.  A § 1983 equal protection claim may be predicated upon sex discrimination in public employment or, in some circumstances, on sexual harassment in the workplace.  See Annis v. County of Westchester, 36 F.3d 251, 254 (2d Cir. 1994).  The Equal Protection Clause, through § 1983, "protect[s] public employees from various forms of discrimination, including hostile work environment and disparate treatment, on the basis of gender.  Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals."  Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006).  Other differences include, *inter alia*, the timing of when an action may be brought and the necessity of showing that discrimination was intentional in a § 1983 equal protection claim.

   To establish a claim based on a hostile work environment, a plaintiff must show "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  In so doing, the plaintiff must demonstrate both a subjective perception that the environment is abusive and that the environment was objectively hostile and abusive.  Hayut v. State University of New York, 352 F.3d 733, 745 (2d Cir. 2003).  Isolated incidents may only give rise a hostile work environment claim if

they are sufficiently severe so as to alter the terms and conditions of employment as to create such an environment; otherwise, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002); Demoret, 451 F.3d at 149.  A court evaluates the totality of the circumstances which may give rise to a hostile work environment claim, taking into account such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris, 510 U.S. at 23.

In the instant case, Defendants argue that the individual hostile workplace claims against Gorsline and Williams should be dismissed on the ground that Plaintiffs do not sufficiently show Defendants' personal involvement in any constitutional violation.  In making this argument, they seek to frame Plaintiffs' allegations concerning Williams as depicting merely isolated incidents which lack in severity.  DML at 7.   The Court is unpersuaded.  Regardless of whether certain of the specific incidents recalled by Plaintiffs concerning conduct by Williams might, taken together, rise to the level of supporting a hostile work environment, Plaintiffs allege a pattern of activity and verbal harassment by Williams that extends well beyond those incidents.  Contrary to Defendants' contentions, the incidents involving the fake breast, bra-wearing and oranges, as described by Plaintiffs, are not isolated events, but occurrences within a workplace context that implicates Williams and his serial treatment of Plaintiffs over time; the incidents are, however, significant demonstrative events within that context.  In view of the totality of Plaintiffs' submissions depicting a sexually demeaning and discriminatory environment at the DPW that variously targeted the Plaintiffs and in view of Williams' central role in generating that environment, the Court cannot

15

conclude that Williams did not alter the conditions of the Plaintiffs' employment to create an abusive working environment.  For purposes of surviving summary judgment, the subjective and objective components of Plaintiffs' claims are met with respect to Williams.   Thus, the Court is unable to conclude that no reasonable trier of fact would find in favor of Plaintiffs.  Summary judgment is denied as to the § 1983 claims against Defendant Williams.

Gorsline, as Superintendent of the DPW and supervisor of both Williams and the Plaintiffs, occupies a different position than Williams in an analysis of the § 1983 claims.  The personal involvement of a supervisory defendant may be shown by evidence of, *inter alia*: participation directly in the alleged constitutional violation; failure to remedy the violation after being informed through a report or appeal; creation or allowance of the continuation of a policy or custom under which unconstitutional practices occur; or gross negligence in supervising subordinates who commit the wrongful acts.  Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).  The Supreme Court ruling in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), cast doubt on the viability of some of these factors in discrimination suits.  The Court ruled that mere knowledge and acquiescense does not suffice to create liability under that type of claim.  Iqbal, 129 S. Ct. at 1949.  However, the Court's ruling certainly does not prevent finding supervisors liable when their direct participation is alleged or where they have purposefully violated their "superintendent responsibilities."  As such, Defendants' argument that Gorsline did not directly participate in inappropriate or wrongful sexual conduct against Plaintiffs in unavailing.  DML at 7-8.  While Plaintiffs directly implicate Gorsline in some measure, particularly in terms of gender discrimination, their claims against him rest on his supervisory role and his full knowledge, at least passive acceptance, and failure to act an ongoing hostile work environment, despite directly witnessing multiple incidents and becoming aware of

16

Plaintiffs' distress.  Accordingly, as Gorsline exhibits a sufficient level of personal involvement to be held liable, summary judgment as to the § 1983 claims against him is denied.

   *c. Individual Liability under Title VII*

   Third, Defendants seek to dismiss all individual claims brought pursuant to Title VII. Defendants correctly state that individual persons are not subject to liability under Title VII; the law is settled on this point, regardless of whether an individual exercised supervisory authority.  <u>See, e.g.</u>, <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 221 (2d Cir. 2004).  Accordingly, to the extent that Plaintiffs sue Gorsline and Williams individually under Title VII, any such claims are dismissed with prejudice.

   *d. Hostile Work Environment*

   Fourth, Defendants contend that the record before the Court fails to establish that the alleged sexual harassment of Plaintiffs was sufficiently pervasive or severe enough to rise to the level of creating a hostile work environment.  Resolving ambiguities and inferences in favor of the non-movants, if the record does not support the existence of a hostile work environment, such that a reasonable jury could not find for the Plaintiffs, the Court must dismiss the Title VII and § 1983 claims asserted on that basis.  As stated above, "[t]o defeat a motion for summary judgment on a claim of racially hostile work environment, 'a plaintiff must produce evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment.'" <u>Patterson</u>, 375 F.3d at 226 (quoting <u>Cruz v. Coach Stores</u>, Inc., 202 F.3d 560, 570 (2d Cir. 2000)).  There must be a specific basis for attributing the conduct which so alters the victim's employment to the employer.  <u>Richardson v. New York State Dep't of Correctional Serv.</u>, 180 F.3d 426, 436 (2d Cir. 2009).

Defendants' broad argument overlaps with their previous contentions about what the record demonstrates.  Addressing the Defendants' argument for dismissal of the § 1983 claim against the City of Kingston, the Court denied dismissal upon finding that, for purposes of surviving summary judgment, Plaintiffs adequately show a failure by the DPW and the City to deal with endemic sexual harassment and discrimination within the DPW.  The Court also denied Defendants' argument to dismiss the individual § 1983 claims against Gorsline and Williams, finding that the record demonstrates sufficient personal involvement by each in violating Plaintiffs' equal protection rights. Thus, while the focus of previous arguments was narrower, speaking to whether the record supports municipal liability and individual liability under § 1983, Defendants' again seek to dismiss Plaintiffs' claims on the ground that, as a matter of law, a hostile work environment cannot be shown based on the extant record.

The Court, consistent with its prior rulings, does not accept Defendants' characterization of the materials before it.  Drawing all factual inferences and resolving all ambiguities in favor of the non-moving Plaintiffs -- and there are many factual disputes between the parties -- the Court observes the basis of a viable hostile work environment claim which would fulfill the requisite objective and subjective elements of such a claim.  Hayut, 352 F.3d at 745.  The Plaintiffs allege both significant, particularized incidents of sexual harassment and a pervasive pattern of sexual harassment and discrimination to which they were subjected; this pattern is comprised of actions directed at the Plaintiffs as well as the sexualized workplace environment alleged to have prevailed at DPW.  In the absence of any policy or efforts to prevent sexual harassment and discrimination at the DPW, and compounded by Superintendent Gorsline's hiring of, sexual affair with, and preferential treatment for a young woman, the records shows that the DPW may have become

suffused with sexually-discriminatory behavior that substantially damaged the Plaintiffs' experience in the workplace.  In the environment that prevailed, Plaintiffs allege that Williams and others were able to harass with impunity and engage in the recounted incidents with the full knowledge and occasional participation of Gorsline.  Edwards alleges conduct which is especially offensive in view of her having undergone a mastectomy; Soria alleges that she was subjected to frequent and repeated sexual comments which materially impaired her at work; Huppert also alleges extensive sexual harassment of a fairly severe nature, including co-workers betting on her undergarments, looking up her dress, and Gorsline giving her with a "bitch of the year" award.  Finally, serious factual allegations of retaliation have been asserted by Plaintiffs concerning their treatment after the filing of this action.  On this record, a reasonable jury weighing the severity of the incidents, the frequency of demeaning sex-based speech and conduct, and the practice of gender discrimination at the DPW could find that the Plaintiffs' employment conditions were adversely altered by the totality of their sex-based harassment and discrimination.  Defendants' minimize the potential gravity of the record, seeking to place the it within case law dismissing hostile work environment claims on summary judgment.  On the facts of the instant case and in light of the material disputes which remain, however, Defendants' Motion must be denied, and Plaintiffs' Title VII claims may proceed.

  *e.  Title VII Vicarious Liability*

  Fifth, Defendants argue that if the Court finds that Plaintiffs may have been subjected to a hostile work environment, the City of Kingston cannot be held vicariously liable under Title VII. There must be a specific basis for imputing to the employer the conduct giving rise to the hostile environment.  See Schwapp, 118 F.3d at 110.  In hostile work environment claims under Title VII, the default rule is that "an employer is subject to vicarious liability to a victimized employee for an

actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); see also Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 744 (1998).  Nevertheless, this principle is subject to an affirmative defense when no tangible employment action is taken. Faragher, 524 U.S. at 807.  A defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, by establishing two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Id.

The City of Kingston, as a municipality, is an employer under Title VII and may therefore be held vicariously liable, absent an affirmative defense.  See Association Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 273 (2d Cir. 1981).  According to Defendants, the City did enact a sexual harassment policy, had a Human Rights Commission, and took reasonable steps to address Plaintiffs' complaints.  DML at 17-18.  Defendants further contend that Plaintiffs "refused to follow up with the City Office of Human Rights" at some point after filing complaints and thus failed to avail themselves of corrective opportunities.  Id.  Given the record before the Court and Defendants' position as the moving party, these arguments are without merit.

As discussed in the background section to this opinion, according to Plaintiffs' submissions, the City had no sexual harassment policy prior to a point after Plaintiffs' complaints, no system in place for addressing sexual harassment or discrimination claims prior to Plaintiffs' complaints, and provided no sexual harassment training to Gorsline or others at the DPW.  Moreover, Superintendent Gorsline had first-hand knowledge of and indeed participated in alleged sexual

harassment in that workplace.  The Mayor was alerted to several situations involving sexual

harassment and discrimination at the DPW, but remedial action did not ensue until later.  The City

did not impose and disciplinary measures on or investigate Gorsline and Williams in relation to

Plaintiffs' allegations.  The Sexual Harassment Panel that was ultimately created met only once and

included Defendant Williams as one of its three members.  As for the Human Rights Commission,

Plaintiffs recount that the Commission itself informed them that it was incapable of effectively

addressing their complaints and recommenced it pursue other avenues.  In short, Plaintiffs

demonstrate a litany of reasons ways in which the City failed to "exercise[] reasonable care to

prevent and correct promptly any sexually harassing behavior."  Faragher v. City of Boca Raton,

524 U.S. at 807.  Conversely, Defendants' argument elides the late timing and questionable

substance of the City's allegedly reasonable steps.  The Court identifies no basis for finding on

summary judgment that the City of Kingston cannot be held vicariously liable for Plaintiffs' Title

VII claims.  Defendants' Motion is denied.

## V.      CONCLUSION

Accordingly, it is hereby

**ORDERED**, that Defendants' Motion for summary judgment (Dkt. No. 16) is granted in part and denied in part, consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the individual Defendants Gorsline and Williams may not be held liable under Plaintiffs' Title VII claims; however, summary judgment is denied with respect to Defendants' other arguments raised in their Motion; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED.**

DATED:        September 20, 2010
                    Albany, New York

Lawrence E. Kahn
U.S. District Judge

22